Argument not to exceed 15 minutes per side. Mr. Grostek, you may proceed for the appellant. Good morning. Christian Grostek on behalf of Mr. Quintana. I'd like to reserve three minutes for rebuttal. And may it please the court. The district court committed two evidentiary errors in this case that predated the The first is it admitted Facebook records without authenticating that they were actually his. And the first place to look at on this issue is what the court said, its basis for admitting the records, which is at page ID 719. And the court said the certificate of authenticity from Facebook combined with some of the details in Exhibit 17A, which lists Mr. Quintana's name, two email addresses, a phone number, and a city. Now, none of those things, none of those details are verified by anyone. I could go on Facebook right now and write down those same things. So tell me if I'm missing this. Was the key point of the Facebook to get his phone number? The key point at trial? Yes. Of using the Facebook page was to get his phone number, your client's phone number. At trial, my understanding, my read of the transcript is that there were the two cooperating witnesses. And each of them had serious credibility problems. So the idea was that the Facebook records plus the phone number that was supposedly gotten through Facebook and everything else would bolster their testimony that they were talking to Quintana and not someone else. What I'm getting at is I thought the key point of the Facebook evidence was it confirmed this one phone number. And if that's Quintana's phone number, that's a problem because there's quite a bit of usage of it with the other people in the conspiracy. And I thought there was quite a bit of other evidence confirming that that phone number was indeed his phone number. So that's what seems tricky about this. I think the primary purpose is that phone number, yes. So isn't that a problem if there's quite a bit of information that shows this was your client's phone number? It would absolutely be a problem. The issue is if it's cumulative evidence, if there's an error, could it be harmless? Absolutely. I absolutely agree. Well, why doesn't that work then? Why isn't it harmless? Right. And the key then is we need to look at what is the other evidence that this was actually his phone number, right? Aker says, I talked to him. The government says he recognized his voice. That's not what he said. At page ID 970, Aker says, I don't remember whether I talked to him after July. And then on redirect, three pages later, the government says, well, didn't you talk to him in October? Yes. There's nothing that says I recognized his voice. And that then could turn also on the Facebook record. Why does Aker think it's Quintana? Because I got the number from his Facebook record. And I used air quotes there because it's not clear that it's his Facebook record. Then Humrich says, well, I communicated with that phone number too. But again, now we're relying on Humrich's testimony. And that introduces the same problem at the base of the entire case, which is the case comes down to do you believe them or not. There are text messages and phone records. Why wouldn't he know it's his phone number? Why wouldn't he know? Why wouldn't he know it's his phone number? Why wouldn't Humrich know it was Quintana's phone number? He wouldn't necessarily. I guess I should take a step back. He recognized his voice, didn't he? Humrich says, I talked to Quintana on this phone number. That's absolutely correct. Aker says, I talked to Quintana, though he doesn't say I recognized his voice. I'm focused on Humrich. Okay. So deal with that. What does the evidence show on that point that he recognizes the voice, knows it's the phone number, it's this phone number? Yes. How do we get out from under that problem? I don't see it as a problem because it all rests on whether you believe Humrich or not then at that point. Humrich, his testimony is, I met Quintana in Arizona, then I talked and texted with him on this phone number. If a jury believes all of that, they would convict Quintana. There's no question about that. But the government conceded that Humrich's testimony was suspect. And in fact, we know he lied. It was just a question about did he lie in his testimony or did he lie when he was being secretly recorded when he first met Aker? So, again, it just comes down to that at the base of that is do you believe Humrich or not? So the argument about the Facebook evidence is that it bolstered Humrich's already suspect credibility and therefore was not harmless. That's exactly right. That's exactly right. And one way I've been thinking about this is if you pull out the Facebook record, then there is evidence that they were talking to someone on the phone at a particular phone number. But there was no, for example, subpoena to the phone company that this was Quintana's registered phone number or billing records that showed that it was paid by his credit card. There was nothing other than their testimony and the Facebook records to say this was him and not just a phone number. So, again, if the case rests on Humrich and Aker, which the government conceded to the jury it did, then the question is if their credibility is suspect and, again, the government conceded to the jury it did, what else is there to support it? Of course, the judge was pretty careful here and gave limiting instructions, gave cautions to the jury that both Humrich and Aker were suspect and their testimony shouldn't just be believed at face value. So how does that factor into our thinking here? I think it bolsters my argument on prejudice, which is the supposedly corroborating evidence becomes all the more important. The judges told the jury, just like the government did, be careful with these witnesses. And so now we need to look at the rest of this evidence. Now, the Facebook records, they're not even admissible without authenticating them as Quintana. Now, that's a strong statement, so I want to make sure that I clarify. In the Facebook records are out-of-court statements being introduced for the truth of the matter, like, my name is Mike Quintana. Just like if I went online and put that in and then Facebook records it. That's not Facebook's statement, that's the declarant's statement that Facebook is just storing. So unless they're Quintana's, that part of the record isn't even admissible. Same thing with the phone number, the email addresses. All of which are unverified. There was no testimony, no other evidence that they were actually Quintana's. So unless those records are authenticated as Quintana's, they don't come in. And again, when we turn to what the court had in front of it, it had the Certificate of Authenticity, which says this is a Facebook record. Concede that. And look at what's on 17A. His name, two email addresses that no one ever testified he used. There was no evidence he ever used them. A phone number that no one testified he used. And that was different from the phone numbers that other people did use. So is the theory that someone created this to implicate him? That could absolutely be true. We know that there were two Facebook profiles, that was the testimony, that allegedly reached out to Aker in October. And Aker said they were both Quintana. Now, it can be Humrich reaching out to Quintana, it can be Humrich using... Tell me, this shows my own cluelessness, but how this should work. I mean, I would think you get all this in front of you. You get the thing from Facebook, this other information, including his name. But again, that could be doctored. I get it. And let's say at that point the trial judge says, well, you know, I'd like to talk to Akers and Humrich. Akers says what he says. It's vague, the way you characterize it. But Humrich says, no, I recognize his voice. It's this phone number. Yes, this is the number I used. Would it have been appropriate at that... wouldn't that be enough to... I think that may have been enough. I used that phone number. That phone number is the Facebook phone number. Yes, it could be... So why isn't that, looking back on it, what ultimately happened? You're just going to say because you don't have to believe Humrich. But no one knows what to believe when you're trying to admit this stuff. And it seems to me you're trying to authenticate it. And if Humrich says I recognize his voice and he used this number, why isn't that enough to just not worry about this? I want to clarify... What am I missing? I'm sure I'm missing something. Go ahead. I want to clarify one thing, which is the number Humrich used was different from the number recorded in Facebook. It was Aker who testified I talked to this number I got through Facebook. Oh, I thought Humrich did as well. Humrich said I met Quintana through Facebook, but there was no testimony about what Facebook profile or what number he got it from or anything like that, yes. The second thing then would be, yes, the court could rely on testimony. If Humrich came in and said, this is the Facebook profile, yes, that's a good example of how it could be authenticated, actually. I connected with someone on Facebook via this profile. I made plans to meet with them, and then I did. That would show it's theirs. This all comes down, in your view, to whether Aker's stuff sufficed as to the phone number. It would if that was presented as the basis for authenticity, but it wasn't. No, but I don't really care if after the fact enough evidence comes in to make it harmless. That's how we started. Well, there's two layers of potential harmlessness here. The first is, was it harmless to authenticate the record, meaning there could have been later evidence that the court didn't rely on at the time that it could have used to authenticate the record? Now, that's not appropriate for this court to step in, though, because we don't search the record for different bases that weren't presented to the district court on an abuse of discretion review. No, but we have harmlessness. Harmlessness on the fundamental trial issue absolutely comes down to what your Honor just said, which is, if a jury certainly, or with fair assurance, under the Kodiakow standard, would have said, we believe Aker, this was the right phone number, that was Quintana, then it's a harmless error. I would just point to the fact that Aker himself first testified, I don't remember talking to him in October. And only on redirect, on leading questioning from the government, did he say, oh, yeah, I did talk to him in October. There's no way we can say, with fair assurance, that the jury would have believed him the second time and not the first time. Briefly, on the hearsay issue, I'd also like to jump to prejudice, actually, again. Part of what the government used to bolster Humrich's testimony was the idea that Quintana was passing him threatening notes and other things in jail. There was already reason to believe that Humrich was not telling the truth about this. One of the things he said was passed to him was his PSR, but there was no evidence introduced or even a suggestion of how someone other than Humrich could have gotten his PSR, which is confidential, only available to him and his attorney. And he did concede his attorney did give him a copy. So then when... Well, I mean, I'll just back up for a minute, but I do know that in other courts it has been a problem, in prison, that it has been a problem that other prisoners demand the PSRs so they can see who's cooperating. That is true. I know this is outside the record. In my experience as working for the Federal Public Defender's Office, what happens is the client themselves ask, I need my PSR so I can show somebody else. It doesn't happen that somebody else in the jail gets their PSR on their own, which is the allegation here. So then... But why? Because they're confidential? But they're not always. I mean, they're not always confidential, and sometimes you can get it through... What's our online system? We didn't have it in Michigan. PASER. Thank you. Yeah, not every court makes them confidential. The testimony here was that it was confidential at page ID 1169-71. I see my time has expired, so I... You get your full rebuttal, though. Thank you very much. Good morning. May it please the Court. Stephen Baker on behalf of the United States, Your Honors. Let me address the last issue the Court raised with defense counsel to make clear something about the PSR in the Western District of Michigan. They are confidential. They are not given out. There is not a manner to get through it from the PASER system, Your Honor. So you're correct about that information in the record, but there is no way that Mr. Quintana could have obtained it through accessing the court system. Someone would have had to give it to him, and there was nothing on the record about how that might have happened. That was only Humrich's testimony. Let me return also and give some clarity on Exhibit 17A and the phone number there, Judge Sutton, your question there. The phone number attached to the Facebook account was not used at trial in order to verify contacts with Mr. Quintana in the course of the allegations. And the reason for that is actually apparent from the cover of 17A. In addition to a great deal of the information that the Court heard about 17A, which is the Facebook business record, it's basically the identification section for this Facebook account. The phone number itself that's here is a number that ends in 4356, and it says here on the record itself, sell verified on November 4, 2016. That's an important date because it is 3 days after the alleged methamphetamine transaction that was presented, where George Humrich delivered 2 pounds of methamphetamine to Kalamazoo on November 1, 2016. The verification is 3 days after. It's a new phone number, Your Honor, after the deal that was proved at trial. And that date's important for the Facebook record, too, because it's the same date that the Facebook record in Government Exhibit 17B, which was not admitted at trial, but the Court did hear evidence about in arguing for authenticity, 17B, it's the same date that Audie Aker was blocked by the individual Mike Quintana. November 4, I think the evidence from the Facebook record supports, is the date that Quintana found out that something bad had happened in Michigan with the methamphetamine he sent out there along with George Humrich. And he changed up a lot of things. So maybe I'm not following you, but I think what you're saying is the Facebook exhibit was not used for his phone number. Correct. What was he used for? It was used for the communications with Audie Aker, and those are Facebook instant message communications, either audio or typed text communications. None of the content from either audio calls or text calls was introduced at trial. Okay, so the messaging, that just begs the question whether this was someone else's page. It does beg that question. If it's not the phone number, what is the authentication? The authentication is that it's registered in his name. Okay, wait, that doesn't do anything. It can be someone else, Your Honor, but what's the question for authentication? It is, is this what it purports to be? Can a reasonable person, based upon the information, conclude that it is what it's offered? We offered it. How do you have any idea, just because it has his name all over it? I mean, that was just what you do? His name is all over it. It's also got his pictures all over it, Your Honor. Anybody can do that. What did you expect them to do, doctor it and then put the wrong picture on? If you're doctoring, it's going to have all the stuff the same. Correct, but it was also invented in September of 2016, a month and a half before this purported deal had to take place. Someone would have had to plan to frame up Mike Quintana a month and a half beforehand, knowing that George Humrich was going to then come to Quintana in later October and ask for an opportunity to make money, and then he'd have an opportunity to send methamphetamine all the way to Kalamazoo, Michigan, something he'd been already discussing to do with Audie Aker in July of 2016. The degree to which the specificity of this frame-up of Mike Quintana through this Facebook page would have had to happen is exponential. There are so many variables that would have had to go into the planning on the basis of the record itself. This was a registered Facebook account with countless photos of Mike Quintana while he's in the hospital, including the photo which was shown to Audie Aker to show him it's Mike Quintana. Audie Aker and George Humrich do not know each other. It was brought out by the government on the record that the entirety of their overlap of communication is the 34 minutes they spend in the hotel room when the methamphetamine is delivered. That's all they get together, and during those 34 minutes they mention the name Mike 10 times, and they mention that he, referring to Mike Quintana, 80 times in those 34 minutes, the entirety in the overlap of their life. And they're there to do one thing, which is Humrich is there to deliver two pounds of methamphetamine to Audie Aker. In addition to that, they share the same phone number for Mike Quintana, which they only get through him. There are 155 phone contacts from the date of October 28th to November 1st, the four days that precede this deal between Quintana and George Humrich. 49 text messages which were ripped from George Humrich's phone. And in those 49 text messages, you see Quintana telling him, hey, I'm going to make this right by you. You're going here. Mike Quintana even passes on the directions that Audie Aker texts to Mike Quintana how to get from Arizona to Kalamazoo, Michigan. He passes on the exact same text. You can see what it forwarded. So the only reason these two men come together is because of Mike Quintana, and both of them testified that that phone number belonged to Quintana. The court raises very good issues about credibility for those witnesses, but those are trial issues for the jury to decide. And going back to the authenticity of the Facebook record, what we're questioning here is, is there enough given for this to be what it purports to be by the government? Now, we said this was Mike Quintana's Facebook page. What did we give the court to believe that? Countless photos of him from a record on a Facebook page that dates a month and a half before this transaction, a registration page which has his name on it and his hometown, and a changed phone number of November 4th. November 4th, the same day that he blocks Audie Aker, our cooperating witness in the case, after things come down and it goes badly because George Humrich is arrested, that's a great deal of information. And we also have both Audie Aker and George Humrich saying he used Facebook in order to contact Audie Aker about the deal in November. That's a great deal of authentication. And the question is, could a reasonable juror find it to be his Facebook page? Yes, they could. Now, should all of those witnesses and any witness that advances this information be questioned? You don't know if somebody else could sign up Mike Quintana and take all these pictures off another page and frame him as this Facebook page. They can be questioned about that, and the jury could consider it. But the question is, should this be admitted based upon all that information and the certification from Facebook that this individual account is as we purport it to be when all we're offering from the account in terms of the exhibits is toll records, essentially, contact between this Facebook account and Audie Aker and Audie Aker thinking it's Mike Quintana, both of the cooperating witnesses identifying him. That is sufficient authentication. That should be admitted. And I will also point out for the court, without that information, how would we ever authenticate a Facebook page? Without the information from the registration, the court is very familiar comparing it to, say, a phone, as we did when you discussed it before, very familiar with phones by drug dealers not being registered in their name. We subpoena in the course of prosecution a great deal of phone information registered to John Doe or registered to an alias for those individuals, yet we have to prove up the phone is used that way. There's alternative proof here in terms of the fact that there was arranged meetings on November 1st by this Facebook account and both of the men that said they arranged it pointed to Mike Quintana as the individual that brought them together. I also want to address the impeachment information. The defense brought out in its reply brief that the government is confused about the impeachment and I will confess that we were confused at the district court in terms of what the information from the second witness, Kyle Mosley, was to be. And I think that's because it presented confusing information to the court. The defense counsel at trial cited 801 as the federal rule of evidence that accepted it from hearsay and that was clearly not what it was because it wasn't an out-of-court sworn statement. Defense at trial did not say that there would be bias proved up by it. He did offer the word impeachment, but it was not clear how he wanted to impeach either George Humrich or Clint Smith as to what was going on. And that lack of clarity, I think, goes not only to the issue of the fact that it wasn't sufficiently offered by the defendant, but also to its materiality. This was not a big issue for the information before the trial court. Clint Smith and George Humrich had never met. They were never in the same jail section and then in actuality on the date of trial, they hadn't been in the same jail for almost five months because of the threats that Humrich had received. We moved him to a different jail. So they were in lockup, two jail cells apart. That was what the testimony was. And that was the only time they were together. To be fair to trial counsel for the defendant, it's probably clear that he didn't know what Kyle Mosley would say either because on the record it's clear he'd only spoken to him for about 15 minutes right before he came up to ask to call him before the court. And so perhaps he was either being intentionally vague or necessarily vague because he didn't understand what Mosley would say. Given that vagueness, the district court did not err in precluding that information. The district court did not abuse its discretion in keeping it out. Impeachment information as to whether or not that should be brought in, it's obvious this court would deal with that de novo, but given that record, it's hard to say that's what was going on. Either way, it's so tangential to the underlying facts of the case. Clint Smith only met Quincana after he'd been arrested and brought to West Michigan. He knew nothing about the underlying facts of George Humrick bringing the two pounds to West Michigan and Audie Aker accepting it, or the 34 minutes they shared that entire conversation where they discussed Mike Quintana. Because of that lack of materiality, there's only harmless error if there's any error at all, Your Honors, and we ask that you affirm the district court's decision and the conviction of the jury. Thank you, Mr. Baker. Thank you. I have three points if I'll get to them. The first is, counsel's taking liberties with the record. There are not countless photos of Mr. Quintana. There was one introduced at trial, and the testimony was that other photos were DMV photos that the agent looked at. That was at page ID 829. The phone number that was supposedly verified three days after the transactions, and so the suggestion, I believe, is that it must have been a substitute, was before the photo that was used, which was uploaded apparently on November 8, according to Exhibit 16, which was filed as an appendix. And then stepping back, everything counsel says that supposedly verifies that this was Quintana's phone number depends on believing that it was Quintana's phone number already. There were text messages with a number. There were phone calls with a number. Humrich and Aker did meet up, but there's nothing that says that's Quintana, except Humrich and Aker, whose credibility was suspect. That's the beginning point of the whole analysis on prejudice. What the court had in front of it when it made the decision to authenticate was a certificate saying this is a Facebook record and items that anyone, including anyone in this courtroom, can walk out of this room and write down on a Facebook record. But doesn't that go to the weight of the evidence rather than to its authenticity? I mean, that's kind of what you're arguing, is that there's a lot to attack on this, but usually when you authenticate a document, it's just is there enough to show that this purports to be what they say it is, not whether it could be impeached or has problems with it. I see you going to the second step on it. Well, that's the test, is whether a reasonable juror could find that this is... Authenticity normally isn't that high of a hurdle. That's correct. You seem to make it a higher hurdle because you say it's got problems with what it has inside it, and it may not be that valuable or may be subject to manipulation and this and that, but that doesn't go to whether the document is what it purports to be. What the government introduced it as is Quintana's Facebook page, and the only evidence that it's Quintana's are those things written down. Yeah, isn't it for the jury? I know you weren't trial counsel, but trial counsel surely could have argued to the jury, here's all these reasons why this isn't Quintana's Facebook page and why you should be suspect, and anybody could make a Facebook page pretending to be you, the juror. Right. This court in Mitz and the Second Circuit in Vayner looked at one, a print advertisement, and another, an online profile with more information than this, and both concluded it was insufficient because this is publicly available information anyone can write down. I see my time is up. I'll leave the remaining points for the brief. Thank you. All right. Thanks to both of you for your helpful briefs and oral arguments. Thanks for answering our questions. We always appreciate it. The case will be submitted.